May it please the Court, I'm John Cappell from the Appellate Staff, Civil Division, U.S. Department of Justice, and I'm representing the Appellant, United States of America. I will attempt to reserve five minutes or so of my time for rebuttal. I'd like to begin my argument by quoting two key sentences from the District Court's opinion that found at page 40 of the excerpts of record. The District Court stated, The Government is correct that the uncontested evidence allows the Court to conclude that S. H. received a brain injury at birth and that this was the injury that resulted in her cerebral palsy. Indeed, it is undisputed that Plaintiff S. H.'s premature birth is the cause of her cerebral palsy. The District Court erred in not recognizing that this was essentially dispositive. I have one question about the nature of the claim that maybe both of you could clarify. And that is whether the claim or the theory is that the underlying negligence occurred in the United States at the outset when the parents were advised that they could safely go to Spain, or whether the theory is something else. The theory is clearly that the underlying negligence occurred in the United States when she was cleared to go to Spain. As a matter of fact, the record also reflects in the undisputed facts and in the District Court's opinion that there was no negligence in Spain by any of the doctors or hospital personnel. So under your theory of the case, there is no lawsuit cannot be maintained for any negligence that occurred in the United States at the outset. That is correct, Your Honor, because the injury occurred in Spain. But I'm asking, I know your legal theory. I'm just asking the practical effect. The practical effect of your position is that, assuming for purposes of my question, that the doctor at the Air Force Base in the United States was completely negligent and reckless in sending this young woman to Spain, she has no recourse against the United States. Well, yeah, that is correct, Your Honor. I just want to make sure there's not some other action of recourse that she might have. Because under 2680K, under the foreign country exception, the relevant point is that the injury occurred in Spain, and there was a single catastrophic injury in Spain that occurred with her premature birth that included the cerebral palsy that was ultimately diagnosed, conclusively diagnosed several years later in the United States. So the place of the negligence is not dispositive, is what you're saying. The place of the injury is all that matters. That is correct, under 2680K, Your Honor. Let me ask you this. What cases do you cite for the proposition that the injury here was actually suffered by Spain? There's a lot of what you're attempting in Sosa. You suffered, I mean, just the Sosa cases. Well, it really ‑‑ Sosa is the lead case. But my question is, after Sosa, cite all the cases that you have that instruct us that the injury here was suffered in Spain. Well, one example is the Tenth Circuit's decision in a case called Manneman, which is cited in our briefs, where the injury, the government failed to diagnose the plaintiff's tuberculosis in Taiwan, and the court found that that was subject to 2680K. But that's not this case, right? Well, it's ‑‑ Here, the mother and the child flew back to the United States, and it was, what southern state are you referring to? South Carolina. South Carolina. And it was determined that this syndrome had manifested itself. Yes, Your Honor. And the key word there is manifested itself. What the district court did was it confused the occurrence of the injury with the alternate manifestation and diagnosis of the injury. Well, I'm just looking for that magic case that you have, the silver bullet that says you suffered the injury, it was suffered in Spain because X, and I haven't found it. I agree, Your Honor, that there is no case directly on point. And that first approach. Yeah, well, we believe that it's controlled by the logic of suicide. What significance, if any, do we give to the fact that Congress in 2860 used the word suffered rather than occurred? Does it say if the injury occurred in some other places, if the injury was suffered? I don't think in the 2680 case it says that. I think 2680 ‑‑ No, it's Sosa that says it. Oh, it says Sosa. Well, we believe that Sosa uses a lot of these terms essentially indistinguishably where the injury was received. The statute says that he claimed arising in a foreign country. Exactly. So the difference between suffered and occurred ought not be of any importance to us, should it? No, we don't think there is any significance. Counselors, I think I'd like you both to discuss the following question, and that is the significance of the administrative claim because the underlying administrative claim was filed while the parents were still in Spain, and at that time they already apparently knew enough to be saying that the child had suffered, I think they said, catastrophic neurological injuries. So is that kind of the end of the matter? Well, yes, Your Honor, we believe that that certainly should be. Not only did they say catastrophic neurological injuries, but they also specifically said cerebral palsy in their assessment. Which was not a 100% certainty after the premature birth, but was a foreseeable manifestation at that time. That's correct, Your Honor. And they also said the same thing immediately upon their return to the United States when they were seeking special help for their child. They said on the form that she had suffered from cerebral palsy since birth. So the claim may have been originally even if all the damages were not yet cleared. Yes, Your Honor. From an accrual standpoint, we would certainly agree we don't want to deal with statute of limitations again. No, there's no reason to do that here because this is not, the key point is that this is not about accrual, this is about 2680K, about the foreign country exception. And I would also note that the You're telling us that the administrative claim that was filed while the couple was in Spain made reference to cerebral palsy. Yes, Your Honor, it did. And the response to that, I take it from, and I'm making a repugnant argument, but I think the response to that has been, well, it was just our lawyer who put that together as a protective or something or another. But I think that is what it actually did say. Exhibit 3T, I think. That's correct, Your Honor. And I'd also further note that two of the plaintiff's agents treating physicians, Dr. Shales and Dr. Delgado, also told the plaintiff's parents in Spain that the child was suffering from cerebral palsy. Now, Dr. Briesemer, their expert witness, said that it was too early to make that diagnosis. But, again, the key point is that he was talking about the diagnosis. Does that matter? In other words, let's assume that something happened in Spain that eventually caused cerebral palsy. Does that mean? And no doctor could tell at the time. They had no knowledge that there was cerebral palsy. And it didn't manifest itself until two years later. For purposes of this statute, would that make any difference as to where the claim arose? No, Your Honor. It wouldn't. It would still have arisen in Spain. Again, there would be an accrual question as to the discovery of the injury. Right, because for purposes of this case, we have the government suffered an unfavorable verdict below. And so it seems to me with respect to disputed factual issues, we have to take them in the light most favorable to your opponent. So what the parents knew or didn't know and what the doctors thought or didn't think are evidentiary matters, are they not? In other words, couldn't the district judge have found on this record that no doctor really gave a definitive diagnosis of cerebral palsy before they came back to the United States? Yes, but again, that's the definitive diagnosis. No, I understand. You say that's irrelevant, but when you start arguing about what doctors told them and what they knew when, my problem is I think there may be contrary inferences to be caught from the record. They may not be important to your case, but you lost the law, so the judge didn't find it in your favor. Well, we believe that both as a matter of law and as a matter of fact, this decision is flawed. It should be reversed, but on the law, it is incorrect, and it's clearly erroneous on the record. So the second one, and I want you to extend your argument, when you say it's clearly erroneous on the record, do you mean the jurisdictional decision by the trial court or the awarding of damages if it has jurisdiction? Well, it's the jurisdiction. We're focusing primarily on the jurisdiction. Now I understand your argument. Yeah. I'm sorry, I guess is it fair to summarize your view of this case and say that a child who is born as a result of negligence is nonetheless barred from any claims under the foreign government exception? I mean, yes, this exemption, the foreign country exemption, so long as the injury resulting from that negligence occurs abroad. Yes, Your Honor. As harsh as that rule may be. Yes, Your Honor, that is our position. And why did the United States take such a harsh position, do you think? Well, Your Honor. To contemplate this case in writing that exception? In the, well, the Congress basically, it wrote this exception very broadly and it was. For other purposes, right, for other reasons. Well, it was also, it was involved, it was concerned about choice of law matters and problems with applying foreign law. For children. For something so impulsive because of negligence. Yes, Your Honor, but, well, that is not. It is still just by tear, tear, tear of their sides. Yes, Your Honor. We want to reserve your side. Thank you, Your Honor. We'll let you do that. We'll hear from the Mr. Stevenson. Thank you, Your Honor. Thank you very much. Good morning, Your Honor. My name is Steven Rich Stevens. I represent the appellees in this matter. Addressing the two topics that the court has raised. First, I don't think the analysis is so simple as the government presents it. Is that to suggest that the child was born in Spain, therefore that is the injury, because that is not the law. That's not the law under SOSA. That was not the common law. We would argue that if you didn't have all this evidence that, in fact, that's where the injury occurred. And then, on top of it, you stipulate, basically, that cerebral palsy was the result of the birth. And then, on top of that, you have the administrative claim being made in Spain, saying that cerebral palsy had happened in Spain. I mean, it seems pretty grim from your side of view. Why should we take a different view? Well, let me address those in seriatim. The emotion aside. Emotion aside, the fact is that cerebral palsy does not necessarily result from a premature birth. No, it's a syndrome. It's a syndrome. That's right. And it does not develop until the child is about, I think, 18 months to two-year level, where we start to see as the neurological system develops. But in Spain, you already were filing administrative claims. Well, jumping to that. Why isn't that a form of judicial admission that you can't walk away from? Because it's a necessary part of bringing a lawsuit against the United States to file the administrative claim. And once you do that, why aren't you bound by what it says, which is we are in Spain. Our child was born with catastrophic neurological problems, including cerebral palsy. Why isn't that something that nobody can walk away from? Well, I think you could treat it as some sort of evidence, but it's evidence that has to be looked at in the entire perspective. Why is it evidence rather than a form of admission? Because the nature of the claim form is to put the government on notice of what the possible damages could be. In this particular case, they had two doctors who were unqualified to diagnose cerebral palsy, Dr. Shales and Dr. Delgado. They are family practitioners, not pediatric neurologists. But the point is that they must have known something was going on. A normal birth with a normal baby, people don't start filing claims of any sort with good doctors or bad doctors. There must have been some problem that caused this. Well, to get into the medicine, the baby did have certain problems as a result of prematurity, and the reason why you can't make a diagnosis. And you knew those problems, and nobody can test this now, because the baby was prematurely born. Right. And the district court noted. And your theory of the case is that the negligence was sending the mother off to a place where the baby was likely to be premature. Right. There was an obvious risk. So don't all injuries arise from the premature birth? Arise from, not manifest themselves, but arise from the premature birth? No. And here's the reason why. Because, and the medical evidence is very clear on this, the symptoms that the baby had between birth and about 18 months, all were the result of prematurity, not necessarily premature birth. I understand your medical contention. I'm asking you a different question. You don't contend that the United States did anything wrong after sending her to Spain, correct? I think they did the best they could. Your claim of negligence is that the negligence occurred in the United States when they sent her to Spain. Yes. And the other part of your claim is that the baby, that the injury occurred because the baby was prematurely born in Spain. Cerebral palsy ultimately is the result of prematurity. Right. I guess the thing that bothers me about your claim sort of from a logical perspective is that once the baby was born prematurely, even though she didn't yet have diagnosable cerebral palsy, it was inevitable at that point. There was nothing that someone could do, as I understand the record, that would prevent it. So it was at the time of birth, even though it hadn't manifested, it was an inevitable development for this child. That's how I understood what happened here. I think the evidence leads to that. However, I think the evidence is also very clear, the law is very clear as we apply the evidence to the law, and that is there is no injury until there is an appreciable injury that's manifested. Really? Let's take mesothelioma. You get it, as I understand it, through breathing in asbestos. Yes. Many people don't get mesothelioma from breathing in asbestos, but many people do. So I go to the great state of New Mexico and I breathe it in in a plant, and in New York, 45 years later, I develop mesothelioma. Where did my claim arise? At the time of the manifestation of appreciable injury. Really? Yes, under California law. No, no. All those cases you cite deal with accrual of statutes of limitations. They don't say where the claim arose. So my question is, under those circumstances, could I really sue John's Menville in New York saying that my claim arose there? Where personal jurisdiction might be, I don't know on those facts. But let me address the question. Well, claim arising is a personal jurisdiction kind of term. We find that in personal jurisdiction cases all the time. You find it in accrual cases. You find it in personal jurisdiction cases. You find it under SOSA. Well, no, you don't find where the claim arose in accrual cases. What you find in accrual cases is when the claim arose. My question is, when we talk about where the claim arose, we do that in personal jurisdiction cases all the time, don't we? You do, but I would also go further and say if you look at SOSA, the whole rationale of SOSA is if we look at what Congress was doing in 1946, what did arising in or arose in mean in 1946? And arose in had a meaning that could apply to many different situations. It arose, the phrase itself, arose as part of the common law in using borrowing statutes for purposes of figuring out the statute of limitations. I see. So, in your investment is to file, assuming you get an adversary decision for this account, is to file a petition for a procedure in state to the United States Supreme Court on behalf of this child. But the result in this case is so harsh, so unjust, that the court should reverse its decision in SOSA to restate the proposition that the cause of action arose in the United States when the negligence occurred in transferring this child's parents to a military-based genetic facility to handle pregnancies. Those kinds of things can happen. Maybe that's the appropriate approach in this case. Well, if we did get an adverse decision, I'm sure we would raise it. I suspect this case is heading to the U.S. Supreme Court regardless of how this court rules. I mean, you can see it's a very important case for the government. If the government could, in their wisdom, be not so harsh in that kind of a position. Because, I mean, what I have not found is a case that meaningfully, or at all, discusses the SOSA principles in the context of medical malpractice, where it seems maybe to have a different shape to it. Well, you're right. As a matter of fact, I wanted to address one of the court's questions that the court posed to my colleague. The court asked, is there any case post SOSA that addresses this provision in the context of medical malpractice? And my colleague cited Manniman, which is a 1967 Tenth Circuit case. And Manniman- Not post SOSA? It's certainly not post SOSA. And I think it was- Given SOSA right now, what we know is it was decided incorrectly. It would be decided differently now. Because SOSA teaches us that you look at where the injury occurred, not where the wrongful act occurred. And under the common law, in 1946, where the injury occurred is where there was appreciable harm. In the vast majority of cases, we know the appreciable harm at the very moment it happens. The air crash at Richards. The car crash. And as we go back to my mesothelioma case, didn't the injury occur when I breathed in? No. The asbestos? No. Because, first of all, it is possible to be exposed to asbestos and not develop mesothelioma. It's possible to be hit on the head and not develop a concussion. But if I'm hit on the head in San Francisco and my concussion doesn't manifest itself until I get to Arizona, didn't my claim arise? Didn't my injury occur in San Francisco? I could see that argument, but I think it would be a very unusual concussion that it waited so long before it manifested. Also, if you got hit on the head that hard to cause a concussion, you had an appreciable injury in San Francisco. But that's when we get back to Dr. Graber's question. Your client, the minor, had appreciable injuries in Spain, did she not? Well, I disagree with that. Yes, because the appreciable injuries that she had in Spain, the seizures and that sort of thing, breathing problems, were all the result of prematurity. As a matter of fact, all the doctors who are qualified to talk about that issue, including the government, didn't call. Your claim sought $100 million in personal injury damages for catastrophic neurological injuries, seizures, and cerebral palsy. That was the administrative claim on which this lawsuit is based, and it was filed when your clients were in Spain. And I guess I have difficulty viewing that as merely some evidence to weigh with other evidence, but it's the predicate for the lawsuit. Right, and one of the things that I wanted to address, we shifted topics, but I wanted to get back to that because I think that's important to the court, I understand that. And that is, is that when two unqualified doctors, as the patient, I don't know if they're unqualified. I'm not saying unqualified is incompetent. Well, the doctors, as it turns out, the unqualified doctors were pretty good at diagnosing precisely what happened and what would happen. They said this child has cerebral palsy. What's incompetent about that? Well, let me make sure. Is that actually your theory of the case? Your Honor, let me make it clear. I'm not saying that they're incompetent. I'm saying they're not qualified to make the diagnosis of cerebral palsy. Why would you argue that? Because it turns out they were eminently qualified to make that diagnosis. Doesn't this child have cerebral palsy? She does, as it turns out. But at that time, they weren't making that diagnosis. As a matter of fact, they were doing it. That's a nutty argument because of the fact that in your very administrative claim, you said the child has cerebral palsy. Yes, Your Honor. It seems to me like you're just winding yourself up in this kind of hysteria of argument trying to persuade us that the child didn't have cerebral palsy, but he did have cerebral palsy. I don't know. I can't follow that. Well, let me see if I can make it clear. I'm just going down a little warren of tunnels that I can't find my way out of here.  The two doctors, two treating physicians, did not make a diagnosis of cerebral palsy. They did not make that diagnosis. Shales and Delgado did not say that. What they did say is that they thought she had it. Based on a report from Dr. Lisa Smith, who is a pediatric neurologist, and how they drew that conclusion is frankly beyond me because Dr. Smith, when she examined the child, she said she can't make the diagnosis of cerebral palsy. So you're not suggesting this child got cerebral palsy in South Carolina, do you? I'm saying no. It was manifested in South Carolina. All that happened is that it manifested in South Carolina. Well, she developed to the point where the symptoms were not developed. But it was caused by the premature birth. Yes. Yes, that's an undisputed fact, Your Honor. I see I have a minute and 20 seconds left. I think we've covered the topics that are most important to the court, but I would love to answer any more questions. I partly would like to add an exclamation point on what I said earlier, that I think it would be absolutely important to take a second look. Thank you, Your Honor. That is, if you could, an adverse decision. Thank you. Thank you. We have a short amount of rebuttal time remaining. Thank you, Your Honor. I really have very little to add to the call equipment. Let me ask you a question related to Judge Osiris. Do you really think the statute was designed to deny an access to relief to people in a situation of misplacement? I think that the statute as written clearly covers the situation. I suspect my SOSA does cover it. My question is, do you really think that was the statutory purpose? Again, as we've already discussed, I think that a lot of factors went into the crafting of it, such as the foreign law. Well, the difficulty here is that this case turns entirely on domestic law. All the negligence is alleged to have occurred in the United States by an agent of the United States. The injury didn't occur until somebody went to Spain. So I think all the reasons that one might think that Congress would have passed this statute don't seem to apply to the situation. Having said that, its language seems to apply. So I'm, you know, and I guess we're stuck with plain language and we have plain language, but I'm sort of asking about statutory purpose. Can you conceive of a statutory purpose of denying this person access to the FCTA? Well, Your Honor, I would also point out that there is a remedy. It's not a judicial remedy. In this situation, the plaintiff can also seek relief under the Military Claims Act, which is just administrative. But so this is, again, this is the way the statute works. Does that suggest that, I mean, this is kind of coming out of left field, but does the potential for a different avenue of remedy suggest that the parties might profitably make use of our mediation unit to resolve this matter? Or is the legal principle too important? Your Honor, I believe that the legal principle is too important, and I also believe, and my understanding is, although I'm not sure this is in the record, but the plaintiff went down that avenue, the Military Claims Act avenue, and was unsuccessful. Okay. Thank you. The case just argued is submitted, and we appreciate both of your arguments and we stand adjourned.
judges: Lucero, Graber, Hurwitz